# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

JOSE H. CALDERON,

    Petitioner,

v.

    CASE NO. 2:07-CV-1280
    JUDGE HOLSCHUH
    MAGISTRATE JUDGE KING

CARL ANDERSON, Warden,

    Respondent.

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. 2254. This matter is before the Court on the petition, respondent's return of writ, petitioner's traverse,[1] and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

## FACTS AND PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> By indictment, defendant was charged with one count of murder, a violation of R.C. 2903.02, and one count of tampering with evidence, a violation of R.C. 2921.12. According to the indictment, on or about January 17, 2005, defendant purposely caused the death of Abraham Conteh, and defendant altered, concealed, or destroyed a knife to impair its value or availability as evidence. Defendant pled not guilty to these charges.

---

[1] Portions of petitioner's pleadings are incomprehensible.

A jury trial, which was conducted with the assistance of interpreters, was later held. At trial, defendant maintained that he acted in self-defense and that he should not be held culpable for Conteh's death. At the close of the state's case-in-chief, defendant moved for acquittal under Crim.R. 29 as to all charges. The trial court granted in part defendant's Crim.R. 29 motion and dismissed the charge of tampering with evidence. However, the trial court denied defendant's Crim.R. 29 motion as to the murder charge.

After deliberating, a jury returned a verdict of guilty as to the charge of murder. Claiming that (1) defendant was not afforded a fair trial due to prosecutorial misconduct, (2) the jury's verdict was not supported by sufficient evidence, and (3) the jury's verdict was against the manifest weight of the evidence, defendant later moved for a new trial under Crim.R. 33. The trial court denied defendant's Crim.R. 33 motion. Thereafter, the trial court entered judgment and imposed a sentence of 15 years to life.

\*\*\*

According to the state's evidence, Conteh and his wife owned and ran a store on Morse Road in Franklin County, Ohio, in which they sold clothing, purses, "hygienic and cleansing supplies," food, and calling cards. (Tr. 26-28, 39, 121.) This store was equipped with a video monitor and cameras (Tr. 32-33), and a security alarm system. (Tr. 35.) Conteh and his wife also kept a gun in the register drawer. (Tr. 36.) Defendant was familiar to Conteh and his wife because, in November 2004, defendant had made a business proposal to Conteh and his wife, which they later declined. (Tr. 36-38.)

During the early evening of January 17, 2005, Conteh, who at that time was outside his store and was partially covered in blood, was observed from a vehicle passing by. (Tr. 40-43, 54-55, 57.) Conteh, who attempted to walk but fell, was "flaring [sic] his hands," apparently attempting to draw the attention of others, and was approximately "midway between the parking lot from the front of the store to the curb." (Tr. 43, 45, 55, 57-58, 59.) A gun and blood were near the steps of the store.

(Tr. 44, 46, 55.) Conteh also had a cell phone in his hand. (Tr. 47, 57-58, 63.)

The passersby initially drove past Conteh's location, but then returned. A passenger in the vehicle called 911 while the driver of the car approached Conteh. (Tr. 44, 55.) When the driver of the car approached Conteh, Conteh was having difficulty breathing (Tr. 48), and he tried to mumble as blood came from his mouth. However, because "[Conteh] had so much blood coming out of his mouth, he could hardly talk." (Tr. 49-50, 55, 57.)

The driver of the car asked Conteh whether he had been shot. (Tr. 50.) Conteh informed her that he had been stabbed, that the gun near the steps belonged to him, that he was a store owner, and that he had been robbed. (Tr. 50, 57.) Another passenger in the car also attempted to assist Conteh. (Tr. 57-58.) Eventually police and emergency medical staff arrived at the scene, and the emergency medical staff quickly left with Conteh. (Tr. 51-52.)

At about this same time, other emergency medical staff responded to a call at an apartment complex that was near the location of Conteh's store. (Tr. 67-68, 80.) While emergency medical personnel traveled to the apartment complex, they heard a call over the radio concerning a shooting near Cleveland Avenue and Morse Road, which was near the apartment complex. (Tr. 67, 80.) When emergency medical personnel arrived at the apartment complex, defendant, who initially identified himself as "Pedro," approached the emergency vehicle and informed emergency medical staff that he had been shot. (Tr. 68-69, 73, 74, 80, 81, 84.) Although there was blood on defendant's jacket, the majority of the blood was concentrated on defendant's left hand. (Tr. 70.) According to one of the emergency medical technicians, the amount of blood that was observed was of a quantity that typically would result "from a fairly substantial laceration or something like that." *Id.* After performing an assessment of defendant, "two small abrasions" or "two small lacerations" on defendant's left hand were discovered. (Tr. 71-72, 81.) These wounds were inconsistent with the quantity of blood that emergency medical

3

personnel discovered. (Tr. 72, 81.) Emergency medical staff detected no gunshot wound or other trauma. (Tr. 82, 83.) When queried by emergency medical staff, defendant stated that he had been attacked at a nearby store (Tr. 73, 75), and defendant also later made a statement indicating that "it was a self-defense matter." (Tr. 85.)

Because defendant claimed to have been shot, emergency medical staff requested backup assistance. (Tr. 72, 82.) Finding that defendant was a suspect in the incident involving Conteh, police later arrested defendant. (Tr. 92.) According to a police officer who assisted in defendant's arrest, defendant stated "that he was in a store, and the guy attacked him. I asked him, you know, what store, what guy, and I don't recall what he said, but that was the general idea of it. He was in a store and somebody attacked him." (Tr. 91.)

Following defendant's arrest, police officers interviewed defendant without an interpreter. (Exhibit 10.) During this interview, defendant described his version of the events that occurred in the store and also told police about the whereabouts of a knife that defendant used to stab Conteh. (Tr. 124; Exhibit 10.) Police officers later executed a search warrant and searched defendant's residence. (Tr. 116-117.) While searching defendant's residence, police discovered a knife in a drawer in the location where defendant stated the knife would be found. (Tr. 116, 117, 124 .) Police officers unsuccessfully attempted to obtain blood samples from the knife. (Tr. 118.)

At the store, police officers found, among other things, a catalogue for products that defendant had earlier attempted to sell to Conteh and his wife, and a second cell phone without its battery. (Tr. 36, 123.) Police officers also retrieved surveillance video from the store. (Tr. 105.)

Because the video surveillance system was a multicamera system, police officers made arrangements to have the store's surveillance video "clarified" so that it could be viewed in "real time," so that police officers "[could] actually watch individual cameras." (Tr. 105, 119, 138-139.) During the clarification process, images from the surveillance video were

> slowed down into "real time" (Tr. 141); however, nothing from the surveillance video was manipulated or changed. (Tr. 143.) As a result of this clarification process, another video was produced and was among the evidence presented at trial. (Exhibit 22.)
>
> At trial, the state also presented testimony from the forensic pathologist who performed an autopsy of Conteh's body. According to this forensic pathologist, at the time of the autopsy, Conteh's body was 71 inches tall and weighed 261 pounds. (Tr. 151.) He concluded that Conteh "died solely and exclusively as a result of a sharp instrument wound to his back with an injury to his left lung and subsequent internal bleeding." (Tr. at 162.) After examining the knife that was recovered from defendant's home, the forensic pathologist also testified that the knife "would be perfectly compatible with the wound that we saw. * * * And like I say, there's other things that you have to do to say that is the one and only knife-sharp instrument that caused this defect, but this would be in a class that would be okay." (Tr. 163.)

*State v. Calderon*, 2007 WL 259251 (Ohio App. 10th Dist. January 30, 2007). Represented by new counsel, petitioner filed a timely appeal. He asserted the following assignments of error:

> 1. The conviction for murder was against the manifest weight of the evidence.
>
> 2. The conviction for murder was not supported by legally sufficient evidence.
>
> 3. The trial court erred in charging the jury on the duty to retreat when the evidence clearly demonstrated that Jose Calderon attempted to leave and was prevented from doing so by Abraham Conteh

*See id.* On January 30, 2007, the appellate court affirmed the judgment of the trial court. *Id.* Petitioner did not timely appeal. On July 20, 2007, he filed a motion for delayed appeal.

*Exhibit 15 to Return of Writ.* On October 31, 2007, the Ohio Supreme Court denied petitioner's motion for delayed appeal. *Exhibit 17 to Return of Writ.*

On June 5, 2006, petitioner filed a petition for post conviction relief with the state trial court in which he asserted the ineffective assistance of counsel and prosecutorial misconduct. *Exhibit 12 to Return of Writ.* On December 5, 2006, the trial court denied the petition. *Exhibit 15 to Return of Writ.* Petitioner apparently never filed an appeal from that decision.

On December 20, 2007, petitioner filed the *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. 2254. He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

> 1. The trial court [erred] in charging the jury on the duty to retreat when the evidence clearly demonstrated that Jose Calderon attempt[ed] to leave and was prevented from doing so by Abraham Conteh.
>
> 2. The conviction for murder was not supported by legally sufficient evidence.
>
> Ineffective assistance of counsel.
> Prosecutorial misconduct.
>
> 3. The trial court erred in charging the jury on the duty to retreat when the evidence clearly demonstrated that Jose Calderon attempted to leave and was prevented from doing so by Abraham Conteh.

*Petition* [sic]. It is the position of the respondent that all of petitioner's claims are procedurally defaulted.

**PROCEDURAL DEFAULT**

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to fairly present those claims to the highest court of the state for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) *(per curiam)*; *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier*, 447 U.S. 478, 485 (1986); *Engle v. Issac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id*. Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal

7

constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall,* 757 F.2d 94 (6th Cir. 1985).

In claims one and three, petitioner asserts that he was denied a fair trial because the trial court improperly instructed the jury on the duty to retreat. In claim two, petitioner asserts, *inter alia*, that the evidence was constitutionally insufficient to sustain his convictions. These claims, being readily apparent from the face of the record, were properly raised on direct appeal; however, petitioner thereafter failed to timely appeal the appellate court's January 30, 2007, decision to the Ohio Supreme Court. Instead, on July 20, 2007, petitioner filed a motion for delayed appeal pursuant to Ohio Supreme Court Rule of Practice II, Section 2(A)(4)(a),[2] which was denied by the Ohio Supreme Court. In *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004), the United States Court of Appeals for the Sixth Circuit held that the Ohio Supreme Court's denial of a motion for delayed appeal under

---

[2] Ohio Supreme Court Rule of Practice II, Section 2(A)(4)(a) provides:

In a felony case, when the time has expired for filing a notice of appeal in the Supreme Court, the appellant may seek to file a delayed appeal by filing a motion for delayed appeal and a notice of appeal. The motion shall state the date of entry of the judgment being appealed and adequate reasons for the delay. Facts supporting the motion shall be set forth in an affidavit. A copy of the court of appeals opinion and the judgment entry being appealed shall be attached to the motion.

such circumstances constitutes a procedural default of the claims raised therein. This Court therefore reaches that same conclusion here.

In claim two, petitioner also appears to assert the ineffective assistance of counsel and prosecutorial misconduct. Petitioner does not further elaborate on the basis for these claims. Presuming that such claims rely on matters that would properly be raised on direct appeal, these claims are likewise procedurally defaulted due to petitioner's failure to raise these issues on direct appeal. The state courts were never given an opportunity to enforce the procedural rule at issue due to the nature of petitioner's procedural default.[3] Further, the state courts must be given a full and fair opportunity to remedy alleged constitutional defects. The requirement that all available claims be presented at the first opportunity serves the state's interests in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Further, the doctrine of *res judicata* is stated in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to review claims on the merits under that doctrine. *See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967). This Court deems the first and second parts of the *Maupin* test to have been met as to petitioner's claims of

---

[3] Petitioner did attempt to raise a claim of prosecutorial misconduct in his petition for post conviction relief; however, the trial court refused to address the merits of the claim as barred under Ohio's doctrine of *res judicata*. *See Exhibit 14 to Return of Writ.* Petitioner likewise attempted to raise a claim of ineffective assistance of counsel in post conviction proceedings; however, this Court is unable to determine from the record the basis for such claim. See Exhibits 12 and 14 to Return of Writ. The trial court denied the claim for failure to set forth any substantive grounds for relief. Exhibit 14 to Return of Writ.

ineffective assistance of counsel and prosecutorial misconduct.

Petitioner can still secure review of his claims if he demonstrates cause for his failure to follow the state procedural rules as well as actual prejudice from the constitutional violations that he alleges. Petitioner has failed to demonstrate either cause for his procedural default or actual prejudice resulting from the alleged constitutional violations.

The Court notes that, in his motion for delayed appeal, petitioner alleged that he did not receive notice of the appellate court's January 30, 2007, denial of his direct appeal until April 17, 2007, and that it took him the approximately three more months, until July 20, 2007, to file his motion for delayed appeal due to his *pro se* incarcerated status. *See Exhibit 17 to Return of Writ.* However, those facts do not establish cause for petitioner's procedural default in failing to file a timely appeal to the Ohio Supreme Court. *See Bonilla v. Hurley, supra*, 370 F.3d at 498, citing *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995).

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. at 491; *see also Sawyer v. Whitley,* 505 U.S. 333.

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316, 115 S.Ct. 851, 130 L.Ed.2d 808. Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial."*Id.* at 317, 513 U.S. 298, 115

> S.Ct. 851, 130 L.Ed.2d 808. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup,* 513 U.S. at 324, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id.* at 321, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

*Souter v. Jones, supra,* 395 F.3d at 589-90 (footnote omitted). Petitioner has failed to meet this standard here.

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

If any party objects to this *Report and Recommendation,* that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C.§636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140, 106 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


February 11, 2009                                          <u>   s/Norah McCann King       </u>
                                                           Norah McCann King
                                                           United States Magistrate Judge